UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

B. GERALD BARTUSH,
as Personal Representative of the
ESTATE OF RANDY M. BERGERON, deceased,

        Plaintiff/
        Counter-Defendant,

        Case No. 5:13-cv-10661
vs.        Hon. Judith E. Levy

THE AMERICAN INSURANCE COMPANY,
a foreign corporation,

        Defendant/
        Counter-Plaintiff

_____/

Stuart A. Sklar (P38146)    D. John Travis (P76871)
Jason J. Liss (P48742)    Sheila A. McKeon (P71834)
**FABIAN, SKLAR & KING, P.C.**    **GALLAGHER SHARP**
Attorneys for Plaintiff    Attorneys for Defendant
33450 W. Twelve Mile Road    39111 W. Six Mile Rd., Ste. 141
Farmington Hills, MI 48331    Livonia, MI 48152
(248) 553-2000    (734) 591-7468
ssklar@fabiansklar.com    jtravis@gallaghersharp.com
jliss@fabiansklar.com    smkeon@gallaghersharp.com

_____/

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE OR LIMIT THE OPINION TESTIMONY OF DEFENDANT'S EXPERTS: DAVID ICOVE, STEPHEN HUME, MICHAEL PRESSON AND BRIAN NETTLETON

NOW COMES Plaintiff/Counter-Defendant ("Plaintiff"), B. GERALD BARTUSH, by and through his attorneys, FABIAN, SKLAR & KING, P.C., and respectfully request this Honorable Court to enter an order excluding or limiting

the opinion testimony of Defendant's experts:   David Icove, Stephen Hume, Michael Presson, and Brian Nettleton, for the reasons identified in his attached brief.

In accordance with E.D. Mich. L.R. 7.1(a), the undersigned counsel contacted attorney for Defendant on February 16, 2015 to explain the nature of this motion and its legal basis and request concurrence in the relief sought.  Defendant, however, did not respond or concur in the requested relief.

Respectfully submitted,

FABIAN, SKLAR & KING, P.C.

*/s/ Jason J. Liss*

Stuart A. Sklar (P38146)
Jason J. Liss (P48742)
Attorneys for Plaintiff
33450 W. Twelve Mile Road
Farmington Hills, MI  48331
(248) 553-2000
ssklar@fabiansklar.com
jliss@fabiansklar.com

Dated:  February 16, 2015

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

B. GERALD BARTUSH,
as Personal Representative of the
ESTATE OF RANDY M. BERGERON, deceased,

        Plaintiff/
        Counter-Defendant,

                         Case No. 5:13-cv-10661
vs.                      Hon. Judith E. Levy

THE AMERICAN INSURANCE COMPANY,
a foreign corporation,

        Defendant/
        Counter-Plaintiff

_____/

| | |
|---|---|
| Stuart A. Sklar (P38146) | D. John Travis (P76871) |
| Jason J. Liss (P48742) | Sheila A. McKeon (P71834) |
| **FABIAN, SKLAR & KING, P.C.** | **GALLAGHER SHARP** |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 33450 W. Twelve Mile Road | 39111 W. Six Mile Rd., Ste. 141 |
| Farmington Hills, MI 48331 | Livonia, MI 48152 |
| (248) 553-2000 | (734) 591-7468 |
| ssklar@fabiansklar.com | jtravis@gallaghersharp.com |
| jliss@fabiansklar.com | smkeon@gallaghersharp.com |

_____/

**BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION IN LIMINE TO
EXCLUDE OR LIMIT THE OPINION TESTIMONY OF DEFENDANT'S
EXPERTS: DAVID ICOVE, STEPHEN HUME, MICHAEL PRESSON
AND BRIAN NETTLETON**

## STATEMENT OF ISSUES PRESENTED

1.    Whether Dr. Icove's opinions should be excluded from evidence at trial as a consequence of Defendant's instructions to him not to answer questions at his deposition and his unilateral refusal to answer others.

       Plaintiff Answers:                "Yes"

       Defendant Answers:            "No"

       The Court Should Answer:     "Yes"


2.    Whether Stephen Hume's, Michael Presson's, and Brian Nettleton's opinions should be excluded from evidence at trial as a consequence of Defendant's failure to disclose Dr. Icove's contributions to their Rule 26 Reports.

       Plaintiff Answers:                "Yes"

       Defendant Answers:            "No"

       The Court Should Answer:     "Yes"

# CONTROLLING AUTHORITIES

## Cases

*Allstate Ins. Co. v. Electrolux Home Prods., Inc.*,
  840 F.Supp.2d 1072 (N.D.Ill. 2012)....................................................................12

*Denham v. Deeds*,
  954 F.2d 1501 (9th Cir.1992) ...............................................................................15

*Hussey v. Chase Manhattan Bank*,
  No. Civ.A. 02-7099, 2005 WL 1787571 (E.D. Pa. July 27, 2005) ......................15

*In re Application of Republic of Ecuador*,
  280 F.R.D. 506 (N.D. Cal. 2012) *aff'd sub nom.*
  *Republic of Ecuador v. Mackay*, 742 F.3d 860 (9th Cir. 2014) ..........................13

*North American Rescue Products v. Bound Tree Medical, LLC*,
  No. 2:08-cv-101, 2009 WL 4110889 (S.D.Ohio Nov. 19, 2009) .........................13

*R.C. Olmstead, Inc., v. CU Interface, LLC*,
  606 F.3d 262 (6th Cir. 2010) ................................................................................23

*Reliance Ins. Co. v. Keybank, U.S.A.*,
  No. 1:01-cv-62, 2006 WL 543129 (N.D.Ohio March 3, 2006) ...........................13

*Republic of Ecuador v. For Issuance of a Subpoena Under*
  *28 U.S.C. Sec. 1782(a)*, 735 F.3d 1179 (10th Cir. 2013) ....................................14

*Republic of Ecuador v. Mackay*,
  742 F.3d 860 (9th Cir. 2014) ................................................................................12

*Townley v. Heckler*,
  748 F.2d 109 (2d Cir.1984) ..................................................................................15

*U.S. v. Gullett*,
  713 F.2d 1203 (6th Cir. 1983) ..............................................................................15

*U.S. v. MacLloyd*,
  526 F.Appx. 434 (6th Cir. 2013) ..........................................................................15

*United States v. Humphrey*,
   696 F.2d 72 (8th Cir. 1982) ...................................................................15

*United States v. Panza*,
   612 F.2d 432 (9th Cir. 1979), cert. denied, 447 U.S. 925 (1980) ................. 14, 15

*United States v. Toner*,
   173 F.2d 140 (3d Cir. 1949) ...................................................................15

## Other Authorities

16B Am. Jur. 2d Constitutional Law § 1014 ..........................................15

## Rules

Fed. R. Civ. P. 26 ...................................................................................11

Fed. R. Civ. P. 26(a)(2)(B) ............................................................... 12, 23

Fed.R. Civ. P. 26(b)(1) ...........................................................................11

Fed. R. Civ. P. 26(b)(3) ..........................................................................11

Fed. R. Civ. P. 26(b)(3)(A) .....................................................................11

Fed. R. Civ. P. 26(b)(3)(B) .....................................................................11

Fed. R. Civ. P. 26(b)(4)(C)(ii) ................................................................13

Fed. R. Civ. P. 26(b)(5)(A) .....................................................................22

Fed. R. Civ. P. 37(c)(1) ..........................................................................23

Fed. R. Civ. P. 37(c)(1)(C) .....................................................................24

## Treatises

5 Wigmore, Evidence § 1391 ...................................................................15

## I.   STATEMENT OF FACTS

This breach of contract case arises from a fire on March 29, 2012 that destroyed Randy Bergeron's ("Bergeron") home and personal property at 26426 Ballantrae in Farmington Hills, MI. (Dkt.# 1, ¶ 8).   The American Insurance Company ("Defendant") insured Bergeron's property against losses resulting from accidental fire. (Dkt.# 1, ¶ 6).   Bergeron timely submitted a claim, which Defendant denied on February 1, 2013. (Dkt.# 1, ¶ 13).   Defendant raised the defense of arson based on its conclusion that Bergeron intentionally set the fire. (Dkt.# 6).  Plaintiff denies the fire was intentionally set, but instead resulted from an undetermined accidental cause.[1]

Defendant has provided Rule 26 reports from each of the following four experts:  Stephen Hume ("Hume"), Michael Presson ("Presson"), Brian Nettleton ("Nettleton"), and David Icove, Ph.D. ("Dr. Icove").   Hume is the former Fire Marshal for the City of Farmington Hills.[2]   As a part of its claims investigation, Defendant hired Presson (an origin and cause investigator) and Nettleton (an electrical engineer) to investigate the fire's origin and cause shortly after being

---

[1]   On September 2, 2013, Randy Bergeron died from causes unrelated to the fire or this case.   On October 10, 2013, B. Gerald Bartush, the personal representative of Bergeron's estate was substituted as Plaintiff in this case (Dkt.# 13).

[2]   Hume retired from the City several months after this fire in June 2012.  The parties deposed him as a fact witness on April 3, 2014.  A little over a month later, he agreed to serve as a testifying expert witness for Defendant (Ex.# 1).

notified of the loss.  On June 6, 2014, long after this action was filed, Defendant retained Dr. Icove to criticize the opinions of Plaintiff's expert, Gregory Gorbett ("Professor Gorbett"), and to bolster those of Hume, Presson, and Nettleton.  (Ex.# 2, pp. 4-5, 50).

Approximately two weeks after retaining Dr. Icove, Defendant provided Plaintiff with Hume's, Presson's and Nettleton's Rule 26 reports. (Ex.# 3-1 through 5-2 respectively).   Thereafter, Plaintiff took their depositions on November 10, 2014, July 16, 2014, and July 17, 2014 respectively.   After it deposed Professor Gorbett, Defendant provided Dr. Icove's Rule 26 report on September 29, 2014.  (Ex.# 2).  Plaintiff took Dr. Icove's deposition on November 11, 2014.  (Ex.# 6).

Throughout the deposition, Defendant repeatedly instructed Dr. Icove not to answer questions concerning:

(a)     the entire scope of the work he performed in this case (Icove Dep., Ex.# 6, pp. 9:3-25, 11:10-16);

(b)     whether he performed a peer review of the work performed in this case by Defendant's experts other than Presson, and/or the substance of that review (Icove Dep., Ex.# 6, pp. 24:1-4, 59:13-19, 124:11-21);

(c)     the first time he reviewed Presson's Rule 26 report and whether he made any suggestions as to what should be contained within it or the role he had in preparing it or any contributions he made to it (Icove Dep., Ex.# 6, pp. 39:3-41:14, 128:11-129:7, 130:21-24, 131:11-15);

(d)     whether he reviewed a draft of Hume's initial Rule 26 report or its supplement, and whether he ever made any recommendations of what should be contained within either of them and/or wrote any portion of

2

them and/or had an role in their preparation and/or made any contribution to them (Icove Dep., Ex.# 6, pp. 41:16-43:17, 129:8-15, 131:6-9, 131:17-21);

(e)     his role in preparing Nettleton's Rule 26 report or any contributions he made to it (Icove Dep., Ex.# 6, pp. 131:1-4, 131:23-132:2, 169:21-170:6);

(f)     his opinion as an expert peer reviewer of the ethics, advocacy and objectivity of a hypothetical expert who provides other experts in a case with information to put in their reports (Icove Dep., Ex.# 6, pp. 48:1-13, 48:21-49:8, 50:2-22; 57:5-25);

(g)     the nature and extent of the opinions he formed after conducting a peer review of Presson's, Hume's and Nettleton's work as to their qualifications to offer their opinions in this case (Icove Dep., Ex.# 6, pp. 191:4-192:11, 193:1-9, 197:3-7, 199:8-16).

Dr. Icove, for his part, unilaterally refused to answer any questions relating to the computer fire modeling he performed on behalf of the prosecution in *State of Louisiana v. Amanda Gutweiler aka Amanda Hypes*, 979 So.2d 469 (2008) ("the Hypes case"), even though Defendant neither objected to any of Plaintiff's questions nor instructed him not to answer.  (Icove Dep., Ex.# 6, pp. 153:13-15, 154:12-16, 155:2-156:7, 157:5-158:1, 158:20-159:7, 159:25-161:13, 161:25-162:4, 162:15-164:24).

## II.     LAW AND ARGUMENT

Throughout Dr. Icove's deposition, Defendant improperly used the work product privilege as a sword, rather than a shield.  Defendant's tactics prevented Plaintiff from conducting meaningful cross-examination of Dr. Icove's opinions, bias, and credibility.  Further, it is apparent that Defendant concealed Dr. Icove's

contributions to its other experts' Rule 26 reports. Defendant's and Dr. Icove's deliberate misconduct has substantially harmed Plaintiff's ability to prepare his case, and as a consequence, the opinions of Defendant's experts must be excluded at trial.

### A. DR. ICOVE'S OPINIONS MUST BE EXCLUDED AT TRIAL BECAUSE HIS AND DEFENDANT'S MISCONDUCT PREVENTED PLAINTIFF FROM CONDUCTING MEANINGFUL CROSS- EXAMINATION.

By way of background, Dr. Icove offers opinions in his Rule 26 report with respect to the reliability and validity of the opinions of the parties' respective experts. With respect to Plaintiff's expert, Dr. Icove offers his opinion that Professor Gorbett's "opinions and conclusions are not reliable and are not scientifically valid." (Ex.# 2, p. 49). As for Hume, Presson, and Nettleton, Dr. Icove offers a diametrically opposed opinion, stating: "The conclusions and opinions reached by Defendant's experts regarding the origin and cause of this fire are correct, reliable, and follow the Scientific Method[.]" (Ex.# 2, p. 50).

With respect to Professor Gorbett's work, Dr. Icove engaged in a lengthy critical analysis exploring whether he: (a) based his analysis upon sufficient facts or data; (b) used reliable principles and methods, and (c) reliably applied the principles and methods to the facts of this case. (Ex.# 2, p. 28). Dr. Icove's analysis of Professor Gorbett's work consumed 21 pages of his report and included numerous citations to scientific literature and published studies, and additionally

4

incorporated photographs and charts to illustrate his various points. Hume's, Presson's, and Nettleton's work escaped this same rigorous critical analysis. Instead, in six conclusory sentences, Dr. Icove lauded their work and opinions without ever exploring whether they based their respective analyses upon sufficient facts or data; used reliable principles and methods; or reliably applied the principles and methods to the facts of this case. (Ex.# 2, pp. 18-20, 26, 48).

For Plaintiff, the different standards Dr. Icove applied to Professor Gorbett's work versus that of Hume, Presson, and Nettleton, created a reasonable inference that he was biased in favor of Defendant's experts. Plaintiff suspected that Dr. Icove had authored or heavily contributed to Hume's, Presson's, and Nettleton's reports and that this was a source of his bias. These were issues Plaintiff intended and expected to explore during his deposition. Plaintiff's efforts were thwarted by Defendant's repeated and improper assertion of the work product privilege:

> Q.   So, tell me whether or not you're prepared to testify about how you performed your analysis of the accuracy of the defendant's expert's opinions?
>> **MR. TRAVIS:   Let me just state that I never instructed him not to answer questions regarding the Rule 26 reports that have been produced in this matter of the experts, his and the other ones.**
>> MR. SKLAR:  Okay.  Then let me do this.
> BY MR. SKLAR:
> Q.   You reviewed the reports of Hume, Presson and Nettleton, correct?
> **A.   Yes.**
> Q.   Not only the Rule 26 reports but reports prepared prior to that, correct?
> **A.   Yes.**

\*\*\*

BY MR. SKLAR:

Q.　Right, you reviewed all their stuff and from that you formed certain opinions, correct?

**A.　Correct.**

Q.　The reports of Presson, Hume and Nettleton that you reviewed, the reliability and credibility of those reports are important in your evaluation in this case, correct?

**A.　Correct.**

Q.　And the methodology by which those reports were prepared is central to evaluating their accuracy, the credibility of the opinions, the reliability of their opinions, correct?

**A.　Yes.**

Q.　Not only for you but for me and for the jury, correct?

**A.　Yes.**

Q.　So, tell me, what input did you have into Presson's report?

　　**MR. TRAVIS:  Objection and instruct not to answer that.**

BY MR. SKLAR:

Q.　Are you refusing to answer the question?

**A.　I've been advised not to.**

Q.　What input did you have into Hume's report?

　　**MR. TRAVIS:  Same objection.**

BY MR. SKLAR:

Q.　You are refusing to answer?

**A.　Yes, sir.**

Q.　What input did you have into Nettleton's report?

　　**MR. TRAVIS:  Same objection.**

**A.　I respectfully decline to answer that question.**

　　**MR. TRAVIS:   And again if you want to ask him about the final Rule 26 report, go right ahead.**

　　MR. SKLAR:   I want to ask him about the whole methodology as to whether he was involved in creating those reports.

　　**MR. TRAVIS:  Well, we'll do the privilege log --**

　　MR. SKLAR:  How so can I assess whether this witness is telling me yes, I agree with what those guys say, how do I know that it's their opinions or they are really his opinions in disguise?  How do I find that out, John?

　　**MR. TRAVIS:  You can ask him about Rule 26 and we'll give you the privilege log and the court will make a**

6

**ruling.**

      MR. LISS:  Wait a second.  This is a question directed to the basis of the opinions and conclusions here and you're refusing to allow us to get to the basis for the opinions and conclusions expressed.  Do you see it a different way?

      **MR. TRAVIS:  I do.**

      MR. LISS:  Okay.  Explain --

      MR. TRAVIS:   The basis of his opinion that the conclusions are accurate is based on their Rule 26 report as I understand it.

      MR. SKLAR:  And I'm entitled to find out what role did he have in preparing those Rule 26 reports.

BY MR. SKLAR:

Q.    So, what role did you have in preparing Presson's Rule 26 report?

      **MR. TRAVIS:  Objection.**

**A.    I respectfully decline to answer that question.**

BY MR. SKLAR:

Q.    What role did you have in preparing Nettleton's Rule 26 report?

      **MR. TRAVIS:  Objection.**

**A.    I respectfully decline to answer that question.**

BY MR. SKLAR:

Q.    What role did you have in preparing Hume's Rule 26 report?

      **MR. TRAVIS:  Objection.**

**A.    I respectfully decline to answer that question.**

BY MR. SKLAR:

Q.    Is there anything contained in Presson's Rule 26 report where you contributed all, any or part of the information?

      **MR. TRAVIS:  Objection.**

**A.    I respectfully decline to answer that question.**

BY MR. SKLAR:

Q.    Is there any part of Hume's report that you contributed all, any or part of the information to that report?

      **MR. TRAVIS:  Objection.**

**A.    I respectfully decline to answer that question.**

BY MR. SKLAR:

Q.    Is there any part of Nettleton's report that you prepared all, you contributed all, part or any information to that?

      **MR. TRAVIS:  Objection.**

**A.    I respectfully decline to answer that question.**

      <u>MR. LISS:  You do realize that all these questions go to</u>

<u>his bias relative to his opinions and conclusions and you are</u>
<u>refusing to allow us to explore that, correct?</u>
     MR. TRAVIS:  If it's privileged it doesn't go to bias in my view.  We'll look at the law, we'll brief it.

(Icove Dep., Ex.# 6, pp. 126-132) (Emphasis added).

Defendant's refusal to permit Dr. Icove to answer questions concerning whether he authored or contributed to Hume's, Presson's, or Nettleton's Rule 26 reports reasonably raises an inference that he did in fact do so.  This inference is buttressed by the fact that Hume's, Presson's and Nettleton's reports were all provided within a couple of weeks <u>after</u> Defendant retained Dr. Icove.  Further, Hume's and Nettleton's supplemental reports (Ex.#'s 3-2 and 5-2 respectively), in particular, are suspiciously similar to Dr. Icove's work product, with their inclusion of previously omitted scientific literature and peer-reviewed studies supporting their methodology and conclusions.  Plaintiff was entitled to know the extent of Dr. Icove's contributions to those reports, and Defendant's instruction ensured that Plaintiff would not learn it.  This, however, was not the only area of cross-examination Defendant obstructed.

Beginning on page 5 of his Rule 26 report (Ex.# 2), Dr. Icove discussed the applicable professional standards of care, and in particular *NPFA 1033: Standard for Professional Qualifications for Fire Investigator*.  Plaintiff attempted to cross-examine Dr. Icove about his opinion of the qualifications of the experts for whom he was vouching.  Defendant blocked this area of cross-examination as well:

8

Q.     And in reviewing the -- performing your peer review of Hume, Nettleton and Presson, you had a concern about whether they were -- or at least Presson and Hume were qualified in the first place, didn't you?

**MR. TRAVIS:  Objection.**

**A.     I decline to answer that question at this time because it's protected by client privilege.**

BY MR. SKLAR:

Q.     Well, you've said that their conclusions are right and if they're not qualified in the first place, I want to know how it is that you could reach the conclusion that they're right.

So, did you ever form an opinion that either Presson or Nettleton was not qualified to render their opinions?  I'm sorry. Presson or Hume.

**A.     At what time?**

Q.     At any time from the time you were hired until you sit here today.

**MR. TRAVIS:  Objection.**

**A.     I respectfully decline to answer that question at this time.**

BY MR. SKLAR:

Q.     Don't you think if you have an opinion that fire investigators who are rendering opinions as to origin and cause are not qualified as a person who professes to have ethical integrity, who professes to champion the cause of professional fire investigation, that you have a duty to express that opinion?

**A.     Yes.**

Q.     Have you expressed that opinion?

**MR. TRAVIS:  Objection.**

**A.     I respectfully decline to respond to that question because it's covered under a client privilege.**

\*\*\*

Q.     Let me ask you this.  Based upon what you've seen to be, what they did in this case, the answer to questions about basic fire dynamics, do you believe that Presson and Hume are qualified to render the opinions that they've rendered?  Whether they are right or wrong is a different issue, but I'm asking you are they qualified in the first place?

**A.     I respectfully decline to answer that question at this time.**

\*\*\*

Q.     And the qualifications about the investigators that you have are things that you are unwilling to disclose now, correct?

9

A.   **The opinions and discussions regarding the investigators are protected as I said before.**

***

Q.   All right. And the people that you were saying are correct to a reasonable degree of scientific and engineering certainty you formulated opinions about their qualifications, correct, you've already said that?

A.   **Yes.**

Q.   Okay. And you are refusing to tell us what those opinions are, right?

A.   **At this time.**

***

Q.   All right. And you were tasked and retained to make a statement in here that you believe that the defendant's experts are correct to a reasonable degree of scientific and engineering certainty, and you say that, you say that on Page 49, you say the conclusions and opinions reached by the defendant's experts regarding origin and cause of this fire are correct, reliable and follow the scientific method.

So, I'm asking you if you have opinions that they may not be qualified, doesn't that at least somehow call to question the reliability of the opinions?

A.   **It could.**

Q.   And since it could, aren't I entitled to find out what issues you had with the individuals who you are saying had reliable scientifically correct opinions, shouldn't I be able to find that out in all fairness?

A.   **If it consisted of discussions I had with Mr. Travis --**

Q.   What difference does it make who you had a discussion with? You've had discussions with Mr. Travis about everything in this report, okay? Everything.

Why is it that when you're critical and have criticisms about the defendant's experts qualifications, you are basically taking the Fifth and refusing to answer? Is it because you're critical of their experts?

A.   **It's because what I was instructed.**

(Icove Dep., Ex.# 6, pp. 191-200).

Again, Defendant's refusal to permit Dr. Icove to answer questions

10

concerning Hume's, Presson's, and Nettleton's qualifications, necessarily raises a reasonable inference that his opinions are unfavorable.   Not one of Plaintiff's questions concerning Dr. Icove's contributions to Hume's, Presson's, and Nettleton's reports, or his opinion of their qualifications, even arguably invade Defendant's work product.

## 1.   DEFENDANT'S ASSERTION OF THE WORK PRODUCT PRIVILEGE WAS UNJUSTITIED.

As the Court is no doubt aware, with the exception of privileged matters, a party may ask the opposing party's expert any question during deposition that is relevant to the claims or defenses being asserted.  Fed. R. Civ. P. 26(b)(1).  While the work product privilege may be a legitimate basis for instructing a witness not to answer a question, the question being asked must call for an attorney's mental impressions or trial strategies before a party may instruct a witness not to answer it.

The traditional work product doctrine is embodied in Fed. R. Civ. P. 26(b)(3).  It protects from disclosure "documents" and "tangible things" prepared in anticipation of litigation or for trial.  Fed. R. Civ. P. 26(b)(3)(A).  When such material is required to be produced, Fed. R. Civ. P. 26(b)(3)(B) mandates that the court protect against disclosure of "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."

Fed. R. Civ. P. 26 was amended in 2010 to ensure that "communications

11

between the party's attorney and any witness required to provide a report under

Rule 26(a)(2)(B), regardless of the form of the communications," are protected

from disclosure, with three exceptions.  Fed. R. Civ. P. 26(b)(4)(C).  An attorney's

communications with an expert are not protected from disclosure "to the extent the

communications: (i) relate to compensation for the expert's study or testimony; (ii)

identify facts or data that the party's attorney provided and that the expert

considered in forming the opinions to be expressed; or (iii) identify assumptions

that the party's attorney provided and that the expert relied on in forming the

opinions to be expressed."  *Id.*

The facts or data an expert "considers" is much broader in scope than those

he "relies" upon:

> With respect to the disclosure obligations, the [advisory committee's] notes indicate that the requirements should "be interpreted broadly" to encompass "any material considered by the expert, from whatever source, that contains factual ingredients" but to exclude the "theories or mental impressions of counsel." Fed.R.Civ.P. 26(a)(2)(B) advisory committee's notes (2010 amendments). Notably, "[t]he disclosure obligation extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert." *Id.; see also Allstate Ins. Co. v. Electrolux Home Prods., Inc.,* 840 F.Supp.2d 1072, 1080 (N.D.Ill.2012) (indicating that discoverable "factual" information includes material that the expert "considered"—i.e., was provided or otherwise exposed to in the course of developing his or her opinions—rather than just the narrower spectrum of material that the expert "relied upon").

*Republic of Ecuador v. Mackay*, 742 F.3d 860, 869-70 (9th Cir. 2014).

Importantly, the facts or data <u>considered</u> by an expert extends to communications

provided by the party's attorney. Fed. R. Civ. P. 26(b)(4)(C)(ii).

Since Dr. Icove testified he had no substantive contact with Defendant's other experts (Icove Dep., Ex.# 6, pp. 106-107), it is reasonable to infer that his contributions to Hume's, Presson's, and Nettleton's reports were funneled through Defendant's attorney. The law is clear, however, that the work product doctrine does not permit an attorney to shield the production of information by serving as a "conduit" between expert witnesses. *North American Rescue Products v. Bound Tree Medical, LLC*, No. 2:08-cv-101, 2009 WL 4110889, *11 (S.D.Ohio Nov. 19, 2009) (Ex.# 7); *Reliance Ins. Co. v. Keybank, U.S.A.*, No. 1:01-cv-62, 2006 WL 543129, *2 (N.D.Ohio March 3, 2006) (Ex.# 8).

Furthermore, the work product privilege does not shield an expert witness's mental impressions, such as the negative ones Dr. Icove clearly has of Hume's, Presson's, and Nettleton's qualifications. "The intention of the work product rule is to protect the mental impressions and legal theories of a party's attorney, not its experts. Fed. R. Civ. P. 26(b) (2010 Advisory Committee Notes) ('[T]he court must protect against disclosure of the attorney's mental impressions, conclusions, opinions, or legal theories under Rule 26(b)(3)(B)')." *In re Application of Republic of Ecuador*, 280 F.R.D. 506, 513 (N.D. Cal. 2012) *aff'd sub nom. Republic of Ecuador v. Mackay*, 742 F.3d 860 (9th Cir. 2014). While the work product doctrine extends beyond a party's attorney to representatives acting on its behalf, "this protection [does] not 'bring expert information within the work-

13

product doctrine.' Fed.R.Civ.P. 26(b)(4) (1970 Comments)." *Republic of Ecuador v. For Issuance of a Subpoena Under 28 U.S.C. Sec. 1782(a)*, 735 F.3d 1179, 1185 (10th Cir. 2013).   Further, "Rules 26(b)(4)(B) and (C) do not impede discovery about the opinions to be offered by the expert or the development, foundation, or basis of those opinions." Fed.R.Civ.P. 26(b)(4) (2010 Comments) . . . Thus, Rule 26(b)(4), especially subdivision (C), restores the core understanding that the work-product doctrine solely protects the inner workings of an attorney's mind." *Id.* at 1187.

Simply put, Defendant did not assert the work product privilege to shield the mental impressions or trial strategies of Defendant's attorneys or representatives. None of Plaintiff's questions called for them.   Rather, Defendant transparently used the privilege as a tactical maneuver to prevent Plaintiff from obtaining testimony it perceived to be harmful to its case.

## 2.   DEFENDANT'S INSTRUCTION TO DR. ICOVE NOT TO ANSWER QUESTIONS DENIED PLAINTIFF MEANINGFUL CROSS-EXAMINATION.

It is axiomatic that cross-examination of an opposing party's expert on matters relating to his opinions, bias, and credibility is an essential mechanism for testing the reliability and credibility of the witness's testimony.   *United States v. Panza*, 612 F.2d 432, 438 (9th Cir. 1979), *cert. denied*, 447 U.S. 925 (1980) (internal quotation omitted).   Cross-examination is a right rather than a privilege. *Id*.   In civil cases, the right to confront and cross-examine witnesses is "a

14

fundamental aspect of procedural due process." 16B Am. Jur. 2d Constitutional Law § 1014 (citations omitted).[3]

A court has discretion to strike the testimony of a witness who refuses to submit to cross-examination, particularly if the refusal is unjustified. *See United States v. Panza*, *supra.* at 438; *Hussey v. Chase Manhattan Bank*, No. Civ.A. 02-7099, 2005 WL 1787571 (E.D. Pa. July 27, 2005) (after extensive, scholarly discussion of the essential right to cross-examination, court strikes testimony of plaintiff who refused to submit to cross exam). (Ex.# 9). Even where the refusal is justified, e.g. assertion of 5th Amendment, the witness's testimony should nonetheless be stricken when it denies a party meaningful cross-examination in violation of his due process rights.[4]

As demonstrated above, Defendant's repeated assertions of the work product

---

[3]    For example, in *Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984), the court held that denial of cross-examination of an adverse expert violated a social security claimant's constitutional right to due process.

[4]    *See U.S. v. MacLloyd*, 526 F.Appx. 434, 444 (6th Cir. 2013) (citing *U.S. v. Gullett*, 713 F.2d 1203, 1208-1209 (6th Cir. 1983)); *Denham v. Deeds,* 954 F.2d 1501, 1503 (9th Cir. 1992) ("If the witness precludes inquiry into the details of his direct testimony, … the (opposing party) is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part." (internal quotation and citation omitted)); *United States v. Humphrey,* 696 F.2d 72, 75 (8th Cir. 1982)    (holding that a district court may strike all or part of a witness's testimony if the witness refuses to answer questions on cross-examination, particularly if those questions seek to directly assail the truth of the witness's testimony); *United States v. Toner,* 173 F.2d 140, 144 (3d Cir. 1949)    ("'Where the witness, after his examination in chief on the stand, has refused to submit to cross-examination ... his direct testimony should be struck out.'" (quoting 5 Wigmore, Evidence § 1391)).

privilege and instructions to Dr. Icove not to answer Plaintiff's questions were not justified. Even assuming they were, they nonetheless prevented Plaintiff from conducting a meaningful cross-examination, which was clearly Defendant's intent. If given the opportunity, Dr. Icove intends to offer his opinion that Hume's, Presson's, and Nettleton's opinions and conclusions regarding the origin and cause of the fire are "correct, reliable, and follow the Scientific Method[.]" Yet, Defendant prevented Plaintiff from impeaching the credibility of Dr. Icove's opinions when it instructed him not to answer questions relating to his opinions of Hume's, Presson's, and Nettleton's qualifications. Defendant additionally prevented Plaintiff from exposing Dr. Icove's bias and impeaching the credibility of its other experts when it instructed him not to answer questions relating to his contributions to their Rule 26 reports. Unquestionably, these were legitimate areas for cross-examination. Defendant had no right to interfere with and obstruct Plaintiff's cross-examination. Having made the tactical decision to do so, Defendant has forfeited its right to introduce Dr. Icove's opinions at trial.

### 3.   DR. ICOVE'S REFUSAL TO ANSWER QUESTIONS REGARDING THE AMANDA HYPES CASE DENIED PLAINTIFF MEANINGFUL CROSS-EXAMINATION.

The vast majority of Dr. Icove's report is devoted to his criticisms of Professor Gorbett's computer fire modeling. He sets forth at great length, and in great detail, the basis for his opinion that Professor Gorbett's conclusions and opinions are not reliable or scientifically valid. A fundamental reason for taking

16

Dr. Icove's deposition was to identify and expose the shortcomings of his analysis, impeach his credibility, and discredit his opinions.  It was critical to Plaintiff to conduct unfettered cross-examination concerning the computer fire modeling Dr. Icove performed on behalf of the prosecution in the Hypes case -- a case in which his work was thoroughly discredited.  His refusal to testify was so blatantly unjustified that not even Defendant attempted to interfere with Plaintiff's questioning, other than sitting idly by and permitting it to happen:

> Q.   All right.  You're familiar with the Amanda Hypes case, aren't you?
>
> **A.   Yes.**
>
> Q.   And you did fire modeling in that case, didn't you?
>
> **A.   I respect to not answer any questions regarding that fire case.**
>
> Q.   Well, what's the basis?
>
> **A.   The basis is that I was provided secret grand jury testimony regarding that case and any discussion regarding that case might be subject to ethical and/or criminal violations.**
>
> Q.   I have things that aren't subject to the grand jury.  I have your report.
>
> **A.   I respectfully --**
>
> Q.   Sir, you're going to answer these questions here or you're going to answer them in front of the judge.  You're not going to get out of answering these questions because you know and I know the real reason why you don't want to answer these questions, don't we?  Don't we both know the reason?
>
> **A.   My report contains assumptions that were made from secret grand jury testimony --**
>
> Q.   Sir, there's nothing secret about it.  Your report was based upon the information you got from Doctor DeHaan, isn't it?
>
> **A.   Who inappropriately redisseminated to me the secret grand jury information.**
>
> Q.   And there's been Daubert hearings about your work in that case?
>
> **A.   I respectfully request based upon the issues I've just**

**described not to answer any further questions regarding that case.**

***

Q.     All right.  Isn't it true that in the Amanda Hypes case you didn't have all the data either?

**A.     I respectfully refuse not to answer any questions regarding that case at this time.**

***

Q.     Isn't it true that you did not go to the scene in the Amanda Hypes case, yes or no?

**A.     I respectfully request not to respond.**

Q.     Isn't it true that you did not have HVAC data in the Amanda Hypes case when you did your modeling?

**A.     I respectfully request not to respond to that question.**

Q.     Isn't it true that you did not have as-built drawings in the Amanda Hypes case when you did your modeling?

**A.     I decline to answer those questions and any further questions you have regarding that case.**

Q.     Isn't it true, sir, that you reached opinions about the fire that were subsequently refuted by Mr. DeHaan, correct?

**A.     I respectfully request not to answer any questions regarding that case.**

Q.     I'm going to mark as Exhibit 261 a report dated January 29, 2001 -- I'm sorry -- May 26, 2005 that contains your signature, is that correct?  Is that your signature on the front page?

**A.     Yes, sir, it is.**

***

Q.     Isn't it true that John DeHaan hired you to do modeling in that case?

**A.     I respectfully decline to answer any questions regarding this case.**

Q.     Were you someone who did modeling in the Amanda Hypes case?

**A.     I respectfully request not to answer any questions at this time regarding that case.**

***

Q.     All right.   And isn't it true that Amanda Hypes was being prosecuted for arson murder?

**A.     I respectfully decline to answer any questions regarding this case.**

Q.     And isn't it true that you and Doctor DeHaan were hired by the

18

prosecution to do an analysis of the fire for which Miss Hypes was being prosecuted?

**A.      I respectfully request not to answer any questions regarding this case.**

Q.      On the basis of what?

**A.      On the basis of the fact as I explained before that I had access to secret grand jury information and that the discussions of my analysis as well as the information that I obtained may be subject to ethical and criminal or civil violations of law.**

Q.      Okay.  Well, the fact that I have them, I didn't violate any law when I got them.  They're out there in the public domain.  So, what's your reluctance?

      MR. LISS:  These questions don't implicate that.

BY MR. SKLAR:

Q.      These questions don't implicate anything.   I asked you if Amanda Hypes was being charged with arson murder.  You're declining that because there's some secret –

**A.      I'm declining to discuss this case at this time based on the previous information that I've stated.**

Q.      And isn't it true that Amanda Hypes was subject to the death penalty in this case?

**A.      I respectfully request not to answer any questions at this time.**

Q.      Isn't it true that you modeled various scenarios as to where and how the fire started?

**A.      I respectfully request not to answer any questions regarding that case at this time.**

Q.      Isn't it true that Doctor DeHaan relied upon your modeling to support his conclusions regarding the incendiary nature of the fire?

**A.      I request not to answer any questions at this time respectfully.**

                         ***

Q      . . . Isn't it true that after you performed your fire modeling, Doctor DeHaan retracted his conclusions in the case?

**A.      I respectfully decline to answer any questions at this time regarding this case.**

Q.      Isn't it true that Doctor DeHaan stated in a report to the district attorney that due to the limitations of the scene investigators, physical evidence and analytical methods, the original

                         19

conclusion of the undersigned that this fire was ignited in several areas cannot be defended to a reasonable degree of scientific certainty, isn't that true?

**A.** **I respectfully decline to answer any questions regarding that case.**

Q. Isn't it true that all the conclusions that you reached in your fire modeling were ultimately determined to be indefensible to a suitable degree of scientific certainty?

**A.** **I decline to answer any questions at this time.**

Q. Isn't it also true that there were significant errors made by you in the modeling?

**A.** **I respectfully decline to answer any questions at this time.**

Q. Isn't it true that you used the beta version of the fire model as opposed to the one that was actually released?

**A.** **I respectfully decline to answer any questions at this time.**

Q. Isn't it true you used Version 6 for your analysis in that case when Version 6.0.1 was the official release?

**A.** **I respectfully decline to answer any questions at this time.**

Q. Didn't your modeling show significant lack of attention to detail in that case?

**A.** **I respectfully decline to answer any questions at this time regarding that case.**

***

Q. So, what you said, Professor, or, Doctor, is not true, because he didn't use the same version you did, in the Hypes case, you used CFAST?

**A.** **I respectfully decline to answer any questions regarding the case you're describing.**

***

Q. Isn't it true that the version that you used in the Amanda Hypes' case the beta version you used had a bug in it that wasn't fixed until the official release came out?

**A.** **I respectfully decline to answer any questions at this time.**

Q. And isn't it true that the bug in the version that you used resulted in there being errors in your model with respect to the input order of the vents?

**A.** **I respectfully decline to answer any questions at this time.**

Q. And that under that version the input order of the vents mattered in order to get output flows from all specified horizontal vents, isn't that true?

**A.** **I respectfully decline to answer any questions regarding this**

20

case at this time.

Q.   Isn't it true that you used -- strike that.  Isn't it true that the CFAST model that you used in the Hypes case accommodates input variables for weather conditions during the simulation?

**A.   I request respectfully to decline to answer any questions regarding this case at this time.**

Q.   Isn't it true that you failed to include weather data in your model in the Amanda Hypes case?

**A.   I respectfully decline to answer any questions regarding this case at this time.**

Q.   And isn't it true that your failure to include the weather data impacted the air flows induced across openings such as windows and doors due to the differences in interior and exterior pressures?

**A.   I respectfully decline to answer any questions regarding this case at this time.**

Q.   And your failure to use -- input that data adversely affected the reliability of the opinions that you drew from models?

**A.   I respectfully decline to answer any questions regarding that case at this time.**

Q.   Isn't it true that in that case your model produced a conclusion that violated the second law of thermal dynamics?

**A.   I respectfully decline to answer any questions regarding this case at this time.**

Q.   Isn't it true that your modeling showed that temperatures in a hallway where there was no fire were greater than temperatures in a room where there was a fire?

**A.   I respectfully decline to answer any questions regarding this case at this time.**

Q.   Isn't it true that because your modeling was so utterly inept, incompetent and violative of basic scientific principles that the underlying opinion of Doctor DeHaan had to be refuted as being scientifically unsupported?

**A.   I respectfully decline to answer any questions regarding this case at this time.**

Q.   Isn't it true that things that you're critical of Professor Gorbett of in this case you either did or didn't do in the Hypes case?

**A.   I respectfully decline to answer any questions at this time regarding that case.**

(Icove Dep., Ex.# 6, pp. 153-164).

21

While Defendant may not have procured Dr. Icove's refusal to answer questions concerning the Hypes' case, it did nothing to persuade him to answer them either.  Plaintiff's questions went to the very heart of Dr. Icove's credibility on issues directly related to his criticisms of Plaintiff's primary expert, once again denying Plaintiff meaningful cross-examination.   The only appropriate consequence for Dr. Icove's improper refusal to answer relevant questions, and Defendant's manifest complicity, is the exclusion of his opinions at trial.

**B.**   **DEFENDANT VIOLATED FED. R. CIV. P. 26(A)(2)(B) BY CONCEALING DR. ICOVE'S CONTRIBUTIONS TO HUME'S, PRESSON'S, AND NETTLETON'S RULE 26 REPORTS.**

The circumstantial evidence strongly supports the fact that Hume, Presson, and Nettleton "considered" facts or data supplied directly by Dr. Icove or indirectly through Defendant's attorney.  Defendant had an affirmative duty to ensure that this information was disclosed in their respective Rule 26 reports, but failed to do so.  A party withholding otherwise discoverable information from its expert's report, claiming it is protected from disclosure, is required to:  "(i) expressly make the claim; and, (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed–and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).[5]  Defendant's failure to disclose Dr.

---

[5]   Despite the fact that it was required to provide a privilege log prior to Dr. Icove's deposition, to date it has failed to do so, despite its repeated promises.

Icove's contributions to Hume's, Presson's, and Nettleton's Rule 26 reports amounts to a knowing concealment and a flagrant violation of Fed. R. Civ. P. 26(a)(2)(B).

Fed. R. Civ. P. 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The rule permits the court to impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). Fed. R. Civ. P. 37(c)(1)(C). "Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified. The burden is on the potentially sanctioned party to prove harmlessness." *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271-72 (6th Cir. 2010) (internal quotations and citations omitted).

Had Defendant fully complied with Fed. R. Civ. P. 26(a)(2)(B)'s mandatory disclosure requirements, then Plaintiff surely would have confronted Hume, Presson and Nettleton at their depositions with Dr. Icove's contributions to their respective reports. Defendant's obstruction prevented Plaintiff from impeaching

---

(Icove Dep., Ex.# 6, pp. 26:21-27:4, 48:16-19, 50:18, 52:23-24, 53:11-21, 129:21-22, 130:4, 204:7-8, 220:11-22). Its failure to do so is simply inexcusable.

their qualifications, or, as Dr. Icove recognized, call into question the reliability of their opinions.  (Icove Dep., Ex.# 6, p. 200).  Because the time for disclosure is well past, discovery has long closed, and the date for trial looms, the only appropriate sanction under Fed. R. Civ. P. 37(c)(1)(C) for Defendant's failure to comply with Rule's 26's mandatory expert disclosure requirements is the exclusion of Hume's, Presson's, and Nettleton's opinions at trial.

### III.   CONCLUSION

Defendant was well aware that it had no right to instruct Dr. Icove not to answer the questions that were properly put before him.  Likewise, Defendant was well aware that its other experts had a duty to disclose the facts and data supplied to them by Dr. Icove, even if it was done so indirectly through its counsel. Furthermore, Defendant knew that Dr. Icove had no legitimate basis to refuse to answer questions about his work in the Hypes case, yet it permitted him to do so without interference.  Finally, Defendant flagrantly violated its duty to provide a privilege log identifying all of the documents, including attorney communications, considered by its experts in forming their opinions, even after having repeatedly promising to do so.  These were Defendant's choices.  Plaintiff is not obligated to save Defendant from itself by filing a slew of motions to compel it to undo the damage it has caused, which was neither harmless nor substantially justified. Defendant's choices have consequences, and those consequences require its experts' opinions to be excluded at trial.

24

Respectfully submitted,

FABIAN, SKLAR & KING, P.C.

*/s/ Jason J. Liss*

_____

Stuart A. Sklar (P38146)
Jason J. Liss (P48742)
Attorneys for Plaintiff
33450 W. Twelve Mile Road
Farmington Hills, MI  48331
(248) 553-2000
ssklar@fabiansklar.com
jliss@fabiansklar.com

Dated:  February 16, 2015

25

## <u>CERTIFICATE OF SERIVCE</u>

I hereby certify that on February 16, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

Respectfully submitted,

FABIAN, SKLAR & KING, P.C.

*/s/ Jason J. Liss*

_____
Stuart A. Sklar (P38146)
Jason J. Liss (P48742)
Attorneys for Plaintiff
33450 W. Twelve Mile Road
Farmington Hills, MI  48331
(248) 553-2000
jliss@fabiansklar.com
ssklar@fabiansklar.com

Dated:  February 16, 2015